# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

ERICO McCLAM,

    Plaintiff,

    v.

AUDIO VISUAL SERVICES GROUP, LLC
*d/b/a PSAV*,

    Defendant.

Civil Action No. TDC-19-0652

## MEMORANDUM OPINION

Plaintiff Erico McClam has filed this civil action against Defendant Audio Visual Services Group, LLC, d/b/a PSAV ("PSAV") alleging unlawful retaliation in the course of his application for a position as an Audio Visual Technician, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 (2018).  Pending before the Court is PSAV's Motion for Summary Judgment, which is fully briefed.  Having reviewed the submitted materials, the Court finds that no hearing is necessary.  *See* D. Md. Local R. 105.6.  For the reasons set forth below, PSAV's Motion will be GRANTED.

## BACKGROUND

### I.    Doubletree Technician

In November 2014, McClam, an African American man, completed an online application for a part-time position as a PSAV Technician at the Doubletree Silver Spring Hotel in Silver Spring, Maryland ("the Doubletree Technician position").  McClam has a high school diploma and, at the time, had over five years of experience as an audio-visual ("AV") technician.

A PSAV Technician is responsible for setting up, operating, and breaking down AV systems at various hotel events and is also responsible for providing customer service to hotel management and conference attendees.  PSAV Talent Acquisition Specialist Rachel Yellin, who is white, received McClam's application in her capacity as a recruiter and, after performing an initial screen, scheduled an interview for McClam with Damian Textus, the Director of Event Technology ("DET") assigned to the Doubletree and the direct supervisor for the position. Following the December 3, 2014 interview, Textus, who is African American, decided to hire McClam.  In a letter sent by email on December 8, 2014, Yellin extended a conditional offer of employment to McClam at an hourly rate of $14.50 per hour and with a tentative start date of December 17, 2014.  The letter stated that the offer was contingent upon successful completion of a pre-employment background investigation, controlled substance screening, and required hiring forms.  McClam accepted the offer.

Pursuant to its standard hiring practices, PSAV ordered a criminal background check for McClam and received the results on December 10, 2014.  The background check showed that McClam had pending misdemeanor theft and assault charges against him in Montgomery County, Maryland, as well as active warrants relating to both charges.  That same day, Yellin contacted McClam to inform him about the results of the background check.  In response, McClam told Yellin that the background check was incorrect and that, in fact, there were no active arrest warrants for him.  Yellin told McClam that if he had evidence establishing that there were no such warrants, he should provide it to her.  Later that day, McClam produced a letter from the Montgomery County Sheriff's Office stating that because McClam had been served with a warrant in August 2014, there were no active warrants against McClam as of December 10, 2014.

Yellin then asked McClam about the pending theft and assault charges against him and noted that a theft charge may reflect on a candidate's character.  McClam, who was "very offended" by Yellin's statement, told her that he did not like her attitude, that the charge did not reflect on his character because he was falsely accused and had no criminal convictions, and that the case was due to be dismissed on January 29, 2015.  Joint Record ("J.R.") 104, ECF No. 27-1. McClam asserts that during his conversations with Yellin, she offered to hold the position open for him until his criminal charges were resolved.  Yellin, however, maintains that she made no such commitment.  Rather, Yellin asserts that she told McClam only that he would be eligible to re-apply for a position at PSAV once the pending charges were resolved favorably.

On January 18, 2015, McClam sent Yellin an email confirming that the charges pending against him were going to be dismissed at a hearing on January 29, 2015 and offering to provide a report of the incident that would establish that he was falsely accused by a former girlfriend and that he was innocent.  Then on January 21, 2015, McClam called Yellin to follow up on his email. According to McClam, he sought clarification on how PSAV handles applicants who have misdemeanor charges and tried to again explain the circumstances of his pending charges.  When Yellin said she was busy, sounded irritated, and suggested that they just wait until the January 29 hearing, McClam became offended at Yellin's "attitude" and asked her to hear him out.  J.R. 139. When it seemed that she did not want to listen to him, he asked her for the PSAV hiring policy as well as the telephone number for the Human Resources Department ("HR").  She declined to provide the information and hung up.  McClam then called her back and told her she was being "unprofessional" and that she was making him feel "like a criminal."  *Id.*  Yellin asked if she could record the phone call, and McClam consented.  Yellin then stated that McClam had lied on his application by not stating that he had any pending charges.  According to McClam, at that point

he had "had enough," and he "spoke out and over" Yellin and told her she was "not being honest" and said "you're lying" as he explained that the form asked only for disclosure of criminal convictions and did not ask whether he had pending charges. J.R. 44, 139. When he asked for the phone number for HR or her supervisor, she refused to provide the information. He then said that he would find the phone numbers himself.

According to Yellin, during the phone conversation, she informed McClam that PSAV could not wait for the resolution of his charges and was going to move forward to fill the Doubletree Technician position. At that point, Yellin contends, McClam suddenly began interrupting her and yelling at her, called her a "bitch" and used "a lot of cuss words," and threatened her as he complained for several minutes about the unfairness of the situation. J.R. 228–229. Yellin asserts that McClam warned her that he knew where her office was and where her supervisor was. During this "tirade," Yellin told McClam that she could record the conversation so he could later hear how he sounded. J.R. 228. At some point, Yellin hung up the phone and was shaking out of shock and fear, then called her supervisor, Nelson White, to report the call to him. McClam denies that he yelled at or threatened Yellin, or that he used profanity, but he has acknowledged that he may have raised his voice, used a strong tone, and at times spoken over Yellin.

After the call with Yellin, McClam located the contact information for Yellin's supervisor, White, and called him. According to McClam, after he described his situation, White reviewed a computer file relating to McClam, saw that McClam had pending charges to be resolved at the upcoming hearing, and agreed that they would hold the position until after the hearing. McClam told White that he was concerned that Yellin would take the earlier conversation "personally" and that as a result, he would not receive a "fair shot." J.R. 140. White then said he would talk to

Yellin. McClam asserts that during this discussion, he also complained to White that he was being treated unfairly and stated that with the focus on his "criminal information," he felt that he was seen as a "risk based on me being black" and that he was "being discriminated against." J.R. 29.

On January 26, 2015, McClam spoke with White and Yellin on the phone. According to McClam, White and Yellin simply told him that his conditional offer of the Doubletree Technician position was being rescinded and that PSAV had hired someone else for the position. According to Yellin, during that conversation, White told McClam that his original December offer was being rescinded because he had not successfully passed the pre-employment background check. Both sides agree that White told McClam that once his pending charges were resolved, he could re-apply for any open position with PSAV. McClam then expressed dissatisfaction that he would not be automatically hired if his charges were dismissed.

The following day, on January 27, 2015, McClam called PSAV Vice President of Talent Acquisition Robert Caldrone and told him he would be sending him a formal written complaint, which he sent by email that same day. According to McClam, during the phone call he told Caldrone that he believed that he was being discriminated against because of his race. In his letter, McClam complained that Yellin had been "extremely condescending" toward him as early as December 2014, recounted in detail his prior interactions with Yellin and White, and complained that because he had a "signed contract offer," he had a right to a "fair job opportunity" without having to re-interview if his criminal charges were resolved favorably. J.R. 140. He also expressed the view that his employment with PSAV should not be contingent on "personal feelings" and stated, "I am very concerned that I am being set up, as a retaliatory act from your recruiter, to not have a position with your company. I feel I was handled very poorly and if I have to interview

with another site manager I will not be hired because of Rachel's heavy involvement with the managers." *Id.* McClam made no reference to race or race discrimination in his letter.

On January 28, 2015, McClam sent Caldrone another email, this time requesting copies of PSAV's hiring practices and procedures. Caldrone denied the request on February 4, 2015, stating that the materials were confidential and proprietary.

In the meantime, Textus had been interviewing to fill the Doubletree Technician position initially offered to McClam in December 2014. On January 27, 2015, PSAV offered the position to Kerlum Samuels, an African American man, who accepted the job the following day.

## II.     Rockville Technician

On January 28, 2015, PSAV posted a job announcement for a part-time PSAV Technician position that would be based in Rockville, Maryland but would split time between two Maryland hotels, the Hyatt Regency in Bethesda and the Hilton in Rockville ("the Rockville Technician position"). On January 30, 2015, the DETs assigned to these two hotels, Christopher Graves and Charles Bonds, scheduled an interview for this position with Julian Nienaber to take place on February 5, 2015. Nienaber, who is white, had recently received a master's degree in Audio Technology from American University, had a bachelor's degree in Business from the University of Mary Washington, and had prior AV experience.

Also on January 30, 2015, McClam sent an email to Yellin and Caldrone, and sent a text message to Textus, reporting that his criminal charges had been dismissed at the January 29 hearing. On February 4, 2015, McClam filed an electronic application for the posted Rockville Technician position. According to McClam, he received a computerized denial of his application the same day. In his later charge of discrimination filed with the U.S. Equal Employment Opportunity Commission ( "EEOC"), however, McClam stated that his application was denied on

February 7, 2015.  On February 5, 2015, Graves and Bond interviewed Nienaber for the Rockville Technician position and decided to hire him that same day.

### III.    Job Offer

On March 16, 2015, McClam sent a new complaint letter, this time to Kellie Russell, PSAV's Vice President of Human Resources.  In the letter, McClam asserted that he had been subjected to "Unfair, Discriminatory Hiring Practices" and "Retaliation," as well "Mistreatment by a Recruiter and her superiors, Unjust Accusations, Unsubstantiated Claims of Hiring Practices," and "Breach of Contract Terms."  J.R. 151–52.  The letter did not mention race discrimination and instead recounted McClam's interactions with Yellin, complained that Yellin had been condescending and treated him like a criminal, and suggested that the matter could be resolved if PSAV would "honor the original offer for hire."  J.R. 152.  At Russell's request, Caldrone called McClam and told him that he would need to go through the hiring process again if he still sought employment with PSAV and encouraged him to do so.

Unsatisfied with this response, McClam submitted another complaint letter to Russell on April 14, 2015, including the same list of grievances and specifically asserting that PSAV had a contractual obligation to hire him.  Because McClam copied an attorney on this email communication, Russell forward it to PSAV's counsel.  Russell encouraged McClam to apply for several current job openings in the local area.

On April 21, 2015, Russell offered McClam a position as a part-time PSAV Technician with the same job responsibilities and same pay of $14.50 per hour as the Doubletree and Rockville Technician positions.  The position was based at a warehouse in Lanham, Maryland but was a floater position performing work at various hotels in the Washington, D.C. region. In the discussions relating to this offer, Russell explained, "We made the decision to make you an offer

due to the unique circumstances discovered in your background investigation and the fact that you resolved those issues to our satisfaction.  The added delay was due to the expletives and candidly, rude tone of voice you displayed when you spoke with our recruiters.  We are trying to get you on board and put this behind us so you can join the team."  J.R. 163.

McClam denied that he had used profanity, but he acknowledged that his tone "*may* have been strong" and apologized "for any feathers that were ruffled as that certainly was not my intent." J.R. 164.  Although he expressed concerns about the warehouse location, McClam made a counteroffer in which he requested an hourly rate of $22.50 per hour, compensation for lost wages dating back to December 17, 2014 when he was originally supposed to start in the Doubletree Technician position, and a guarantee of first consideration if a position with a more permanent location became available closer to his local area.  Russell declined the counteroffer but noted that McClam would be able to apply to transfer to other positions as they became available without going through the hiring process for outside candidates.  On April 24, 2015, McClam declined to accept the position.

## IV.    Procedural History

After filing a charge of discrimination with the EEOC ("the EEOC Charge") and receiving a right-to-sue letter, McClam filed his Complaint against PSAV on January 11, 2019 in the Circuit Court for Prince George's County, Maryland.  PSAV removed the action to this Court.  In the Complaint, McClam asserts a single count of unlawful retaliation in violation of Title VII and seeks compensatory damages, punitive damages, equitable relief, attorney's fees, and costs.

## DISCUSSION

In its Motion for Summary Judgment, PSAV argues that based on the record evidence, McClam cannot establish a *prima facie* case of retaliation under Title VII because McClam did

not engage in protected activity, cannot establish a causal connection between any protected activity and adverse employment actions, and ultimately cannot establish that PSAV's legitimate, non-retaliatory reasons for failing to hire him were pretextual.  PSAV also argues that the evidence is insufficient to support McClam's claims for damages.  Because the Court concludes that PSAV is entitled to summary judgment on liability, it need not address PSAV's arguments relating to damages.

## I.      Legal Standards

### A.      Summary Judgment

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The Court may rely only on facts supported in the record, not simply assertions in the pleadings.  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party.  *Id.* at 248–49.

### B.      Retaliation

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  A retaliation claim

brought under this statute follows a burden-shifting framework analogous to the discrimination

framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973):

> [A] plaintiff bears the initial burden of establishing a prima facie case of retaliation.
> Once this burden is carried, the burden shifts to the defendant, who is obliged to
> articulate a legitimate, non-retaliatory justification for the adverse employment
> action. If the defendant carries this burden, the onus is on the plaintiff to then
> demonstrate that the non-retaliatory reason advanced by the defendant is a mere
> pretext.

*EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005) (internal citations omitted);

*cf. McDonnell Douglas*, 411 U.S. at 802–04.

To establish a *prima facie* case of retaliation, a plaintiff must present facts that establish

that (1) the plaintiff engaged in a protected activity; (2) the employer took a materially adverse

action against the plaintiff; and (3) there was a causal link between the two events. *Boyer-Liberto*

*v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015). Here, PSAV does not dispute the

second element of adverse action, consisting of the failure to hire McClam. However, PSAV

disputes that McClam engaged in protected activity, and that any such activity was causally linked

with adverse employment actions.

## II.      Protected Activity

In seeking summary judgment, PSAV primarily argues that McClam has failed to present

sufficient evidence to support a finding that he engaged in any protected activity within the

meaning of Title VII. "Protected activity" under Title VII consists of either (1) having "opposed

any practice made an unlawful employment practice" under Title VII; or (2) having "participated

in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-

3(a); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018). Only one of these categories, opposition,

is relevant here. Protected opposition to unlawful employment practices may include "staging

informal protests and voicing one's own opinions in order to bring attention to an employer's

discriminatory activities," as well as "complain[ts] . . . about suspected violations." *Navy Fed. Credit Union*, 424 F.3d at 406 (quoting *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003)).  Employment practices made unlawful by Title VII are those that discriminate against employees on the basis of race, color, religion, sex, or national origin.  *See* 42 U.S.C. § 2000e-2(a) (delineating unlawful employment practices under Title VII).  To have engaged in protected activity, a plaintiff's opposition must be to an employment action that the plaintiff "reasonably believed . . . constituted a Title VII violation." *Netter*, 908 F.3d at 937–38.

In asserting that McClam cannot establish the requirement of protected activity, PSAV argues that (1) McClam's objections to PSAV's hiring practices did not constitute protected activity because he complained not about race discrimination, but about discrimination or mistreatment because he was the subject of criminal charges, which is not a protected category under Title VII; and (2) even if he did complain about race discrimination, he could not have reasonably believed that he had been subjected to such discrimination.  According to McClam's deposition testimony, he first engaged in protected activity on January 21, 2015, when he told White that he believed that he was being subjected to discrimination.  Up to that point, in McClam's discussions with Yellin, he had objected to PSAV's policy of not hiring someone with pending criminal charges and told Yellin that he felt that she was treating him "like a criminal," J.R. 139, but he does not claim that he complained to Yellin about race discrimination.

The evidence that McClam complained about race discrimination to White on January 21 is limited.  McClam's description of that phone call in his January 27 letter to Caldrone makes no mention of race or discrimination, and his deposition testimony about the discussion with White focuses on his concerns about Yellin and his claim that White agreed to hold the Doubletree Technician position open until after his January 29 court hearing.  Nevertheless, although his

recollection of the specific language he used was not precise, McClam testified in his deposition that he also complained to White that he was being treated unfairly, that he believed that he was being discriminated against, and that because "I had the criminal information . . . I felt like I became a risk based on me being black." J.R. 29.  Although White testified in his deposition that he was not aware that McClam had complained about race discrimination, he did not deny that McClam made these statements.  Rather, he stated only that he did not recall any discussion about race with McClam and generally lacked recollection of the content of that discussion and related discussions.  Thus, at a minimum, there is a genuine issue of material fact whether McClam expressed these views to White.

PSAV argues that there was no protected activity because even if McClam mentioned the concept of discrimination, that was insufficient to signal any complaint about *race* discrimination. McClam, however, is not required to use any "particular magic words" to demonstrate oppositional activity under Title VII.  *Young v. Giant Food Stores, LLC*, 108 F. Supp. 3d 301, 317 (D. Md. 2015).  Rather, what is necessary is that the plaintiff "at least have actually opposed employment practices made unlawful by Title VII," rather than have raised generalized workplace grievances. *Id.* (quoting *McNair v. Computer Data Sys., Inc*., 172 F.3d 863, No. 98-1110, 1999 WL 30959, at *5 (4th Cir. Jan. 26, 1999)).  The plaintiff's opposition must also be of a nature that "the employer understood or should have understood" that the plaintiff was opposing an unlawful practice such as race discrimination, rather than some other practice, such as discrimination based on criminal history. *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012).  For example, the United States Court of Appeals for the Fourth Circuit has found that, in context, a complaint of "harassment" may be sufficient to constitute protected activity, even without a specific mention of "sexual harassment."  *Okoli v. City of Balt.*, 648 F.3d 216, 224 (4th Cir. 2011).  Likewise, a plaintiff's

complaint that she and another employee were being "targeted," and her questioning of the "fairness and equality" of the demotion of that employee, constituted protected activity where the two employees were the only African American employees in the section. *See Burgess*, 466 F. App'x at 275, 282. *See also Harris v. Home Sales Co.,* 499 F. App'x 285, 293 (4th Cir. 2012) (finding that a plaintiff's complaints of "unfair treatment," along with protests about a discriminatory demotion and an arguably racist comment made to him, was sufficient to amount to protected activity).

Here, even if McClam did not specifically use the words "race discrimination" when speaking to White, where McClam complained about unfair treatment and discrimination, and also mentioned a concern that he was deemed a risk because of the criminal charges and because he is black, White should reasonably have known that McClam was complaining not only about differential treatment based on his pending criminal charges, but also based on race. In the context of such a discussion, McClam is correct that once he "used the term 'discrimination,' being a black man, one can assume what it means." J.R. 31 (discussing his later conversation with Caldrone). Thus, the Court finds that McClam has established a genuine issue of material fact whether he engaged in protected activity in his conversation with White on January 21.

Similarly, the Court finds that McClam has established a genuine issue of material fact whether he engaged in protected activity in his discussion with Caldrone on January 27, 2015. Although the letter he sent to Caldrone that day asserted that he had the "right to a fair job opportunity," and that he was being "set up, as a retaliatory act from [Yellin], to not have a position [at PSAV]," it did not mention discrimination or McClam's race and instead focused on Yellin's condescending attitude and treatment of McClam "like a criminal." J.R. 139–40. However, McClam has specifically testified in his deposition that in his phone call with Caldrone that day,

he told Caldrone that he believed that he was being discriminated against because of his race, and Caldrone has never specifically denied that fact. Although Caldrone has stated in his declaration that he was not aware of any complaints by McClam of race discrimination until after PSAV received notice of his EEOC Charge on July 16, 2015, McClam's testimony is sufficient to create a genuine issue of material fact whether he complained of race discrimination to Caldrone on January 27, 2015.

Finally, the Court rejects PSAV's argument that McClam had no good faith basis to assert a race discrimination complaint. Even if such a belief proved to be incorrect in this instance, it was reasonable for McClam, as an African American man told that he could not get a job because of pending criminal charges, to consider the realities of present-day society and to have a concern that he was being viewed as a higher-risk candidate because of his race. The Court therefore will not grant summary judgment to PSAV on the grounds that McClam has not provided sufficient evidence of protected activity.

## III.    Causation

PSAV further argues that the record evidence is insufficient to establish a causative link between any protected activity and the adverse employment actions of the failure to hire McClam for either the Doubletree Technician or the Rockville Technician positions. While McClam is not required to establish that the protected activity was a but-for cause of the adverse action, he must make "some showing" of causation, such as demonstrating that the "employer either understood or should have understood the employee to be engaged in protected activity" and that "the employer took adverse action against the employee soon after becoming aware of such activity." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 214 (4th Cir. 2019). "Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the

plaintiff engaged in a protected activity is absolutely necessary to establish" causation. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). More specifically, this element requires that the "relevant decisionmaker," or the company official who made the adverse hiring decision, must be aware of the oppositional activity. *Id.* (finding that the plaintiff failed to establish a *prima facie* case of retaliation because the relevant decisionmaker was unaware that the plaintiff had filed an EEOC complaint). In assessing this question, the Court may consider only acts of protected activity that occurred before the relevant hiring decision. *See Perkins*, 936 F.3d at 214 (noting that the district court appropriately did not consider evidence that the plaintiff engaged in protected activity after the adverse employment action had taken place on the issue of causation). The Court considers whether there is sufficient evidence to meet this requirement as to both the Doubletree and Rockville Technician positions.

### A.    Doubletree Technician

McClam asserts that he was denied the Doubletree Technician position on January 26, 2015, when White rescinded the conditional offer for that position. The only protected activity up to that point was McClam's oral complaint of discrimination to White on January 21. Although PSAV argues that there can be no causation because White did not understand McClam to be asserting a complaint about race discrimination, as discussed above, there is a genuine issue of material fact whether McClam made such a complaint to White. Particularly where White lacked any recollection of the January 21 discussion but acknowledged that "it could have obviously happened," J.R. 282, and phone records and written accounts demonstrate that conversations between McClam and White took place on January 21 and 26, there is evidence that five days after McClam made a complaint that could fairly be construed as alleging race discrimination to a PSAV official, that same official rescinded an earlier conditional offer of employment. This evidence is

sufficient to support a finding of causation.  *See Harris*, 499 F. App'x at 289, 293 (finding that the plaintiff successfully showed causation by demonstrating that the relevant decisionmaker had knowledge of the protected activity from a phone conversation with the plaintiff two or three days before he sent a letter of termination to the plaintiff).

     **B.**     **Rockville Technician**

     As for the Rockville Technician position, that position was posted on January 28, 2015 and filled on February 5, 2015.  McClam asserts that he applied for the position on February 4 but was denied through a computerized notice the same day.  At the outset, the record casts significant doubt on McClam's account of when he was denied this position.  Although McClam testified in his June 27, 2019 deposition that his application for the Rockville Technician position was denied the same day he applied for it, on February 4, 2015, in McClam's EEOC Charge filed on May 6, 2015, McClam stated that he was notified that he would not be considered for the Rockville Technician position on February 7, 2015, two days after the position was actually filled on February 5.  When McClam confirmed that he had reviewed the EEOC Charge before his deposition and was asked if there was anything in the document he would like to correct, McClam responded that there was not.  Moreover, while McClam has produced a February 4, 2015 screenshot of the computerized application system showing that he filed the application that day, and testified that he took contemporaneous screenshots because "with everything that was going on, I just felt like I just needed to put everything on the record," J.R. 50, he notably provided no comparable screenshot from that day showing the entry of a denial.  Instead, he has submitted a screenshot from April 11, 2015, more than two months later, showing that his application had been denied but not identifying the date of denial.

Even accepting, as the Court must at this stage, McClam's uncorroborated testimony that his application was denied on February 4, his claim as to this position fails because he has not provided sufficient evidence to establish a causative link between any protected activity and the denial.  As discussed above, there is evidence of two instances of protected activity before February 4 and 5:  the oral complaints of discrimination to White on January 21 and to Caldrone on January 27.  Here, however, McClam has not provided any evidence that the relevant decisionmakers were aware of any protected activity.  PSAV has provided evidence that DETs Graves and Bonds, who were assigned to the hotels at which the work would be performed, were responsible for conducting the interviews of candidates and making the hiring decision for the Rockville Technician position.  Even after discovery, McClam has identified no evidence that Graves or Bonds had any awareness of McClam's prior complaints of discrimination that would have led them to reject his application for that position.  In fact, there is no evidence to suggest that Graves or Bonds knew who McClam was or anything about him.  There is also no evidence in the record that Graves or Bonds spoke to either White or Caldrone before filling the position.

Although McClam claims that Yellin was the PSAV official who made the decision to reject his application for the Rockville Technician position, he provides no evidence to support this assertion.  McClam bases this view on his understanding that she was the recruiter handling incoming applications for the Washington, D.C. area and because "she was the one I was dealing with" for the Doubletree Technician position.  J.R. 34.  Although Yellin has confirmed that her job focused on the Washington, D.C. area and that she had access to the computerized application tracking system and could change the status of an application, multiple recruiters and Human Resources officials had such access.  There is no evidence that Yellin was personally involved in the posting or hiring for the Rockville Technician position, that she was even aware, by checking

the computerized application tracking system or otherwise, that McClam had applied for it, or that she entered the system and denied his application.

Even if the Court were to conclude that there is sufficient evidence to support a conclusion that Yellin summarily rejected his application, McClam provides no evidence that Yellin was aware of protected activity by McClam.  As discussed above, McClam's complaints about race discrimination before February 4, 2015, if any, were made to White and Caldrone.  Yellin has testified that neither White nor Caldrone spoke to her about any claims of race discrimination by McClam, and that it was not until the questioning in her deposition that she realized that McClam believed that there had been any race discrimination.  There is no evidence, either testimonial or documentary, that shows that such a communication occurred.

Accordingly, the Court finds that McClam has failed to present sufficient evidence to establish that a causal connection exists between the protected activity and the hiring decision for the Rockville Technician position.  The Motion will therefore be granted as to that position.

## IV.     Legitimate Non-Retaliatory Reasons

Where McClam has presented sufficient evidence to establish a *prima facie* case of retaliation as to the Doubletree Technician position, the burden shifts to PSAV to show a legitimate, non-retaliatory reason for the adverse action.  *See Navy Fed. Credit Union*, 424 F.3d at 405.  This burden is "only one of production, not persuasion." *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998).  Because this step "precedes the credibility-assessment stage," all that is required of the defendant at this point is the introduction of evidence which, if "*taken as true*, would *permit* the conclusion" that there was a non-retaliatory reason "for the adverse action."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) (applying this standard to a discrimination claim).  PSAV

is not required to prove the absence of a retaliatory motive. *See Henson v. Liggett Grp., Inc.*, 61 F.3d 270, 274 (4th Cir. 1995) (considering a discrimination claim).

As to the January 26 decision to rescind the conditional offer of employment for the Doubletree Technician position, PSAV asserts that the decision was made based on a combination of the fact that McClam still had pending criminal charges of theft and assault which had yet to be dismissed, and that McClam had engaged in "abusive, erratic behavior" when he was informed that he would not be hired with the pending charges and acted in a "belligerent and threatening manner" during his January 21 phone conversation with Yellin. Mot. Summ. J. at 20, ECF No. 23-1. PSAV contends that these were legitimate, non-retaliatory reasons because a Technician would have access to expensive AV equipment at the worksite and would have to interact in a customer service role with PSAV clients.

It is undisputed that as of January 26, McClam still had pending criminal charges of theft and assault. Despite McClam's assurances to PSAV that the charges would be dismissed on January 29, there was no guarantee that his record would be cleared. PSAV's HR Review Guidelines specifically provide that individuals convicted of theft or assault are ineligible for hiring and provide recruiters with discretion to deny employment to individuals with pending charges and instead to encourage reapplication later. Where McClam's role would have required him to work with expensive AV equipment and manage relationships with PSAV's clients and customers, a decision consistent with these policies would be a legitimate, non-retaliatory reason for denying, or at least deferring, employment to McClam. *See Ahmed v. Am. Museum of Natural History*, 787 F. App'x 37, 39 (2d Cir. 2019) (finding that the failure to satisfactorily complete a background check that was a condition of employment was a legitimate, non-discriminatory reason for withdrawing a job offer).

In addition, PSAV has provided evidence to support its claim that the rescission of McClam's initial offer was also motivated by McClam's rude and abusive exchange with Yellin January 21.  Yellin testified in her deposition that after she informed McClam that PSAV could not wait for the resolution of his charges and was going to move forward to fill the position, McClam suddenly interrupted her and went on a "tirade" and would not let her speak for about three to five minutes.  J.R. 228.  He cursed at her, including calling her "a bitch," *id.*, and whenever she asked him to stop yelling, he became more enraged.  Yellin finally hung up after McClam made some reference to finding the address of her office, which scared her.  The call shook her enough that she had to call a close friend to help calm her down.  Where PSAV has provided specific evidence that McClam engaged in offensive and improper conduct on the January 21 phone call with Yellin that would be relevant to the performance of his job, which included customer service and interactions with clients, the Court finds that PSAV has provided another legitimate non-retaliatory reason to rescind McClam's job offer.  *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 212, 218 (4th Cir. 2018) (finding that evidence that the plaintiff made arguably threatening statements about a supervisor was a legitimate, non-retaliatory reason for a termination); *Ahmed*, 787 F. App'x at 39 (finding that evidence that an individual exhibited behavior towards museum executives that was "sufficiently volatile as to raise concerns" about a contractor's access to museum systems provided a legitimate non-discriminatory reason for terminating the contract).

## V.     Pretext

If the defendant makes a showing of a legitimate, non-retaliatory reason for an adverse employment action, the burden then shifts back to the plaintiff to show that the stated reason was "a mere pretext" for retaliation.  *Navy Fed. Credit Union*, 424 F.3d at 405.  McClam ultimately

bears the burden to show by a preponderance of the evidence that PSAV's explanations are "pretextual or otherwise unworthy of credence." *Henson*, 61 F.3d at 275.

In the face of the reasons proffered by PSAV, McClam asserts that (1) prior to January 26, PSAV had already agreed to hold the Doubletree Technician position for him until after his January 29 hearing; (2) he did not curse at or mistreat Yellin during the January 21 telephone call; and (3) PSAV falsely told him on January 26 that they had already hired someone for the position.

On his first point, McClam testified in his deposition that even with his pending criminal charges, both Yellin and White told him on or before January 21 that PSAV would hold the position open for him until his charges were resolved on January 29, such that the January 26 decision to rescind the offer had to have been motivated by McClam's discrimination complaint, not by his pending charges. Yellin, for her part, has explicitly denied that she ever made such a commitment to McClam, and in fact testified that she told him on January 21 that PSAV would not be able to hold the position for him, which is what prompted the heated argument that day. Nevertheless, where at this stage the facts must be construed in the light most favorable to the nonmoving party, the Court must accept McClam's version as true for purposes of the Motion. While rescission of the conditional offer because of the pending charges was consistent with PSAV's hiring protocols, a sudden switch from agreeing on January 21 to hold the Doubletree Technician position open for another week until January 29, to informing McClam on January 26 that he would not receive that position, on its own might raise concerns.

However, PSAV has not argued that it rescinded the conditional offer solely on this basis. Rather, it focuses primarily on McClam's conduct during the January 21 phone conversation with Yellin, when he allegedly yelled and cursed at her. As Russell told McClam on April 23, 2015, PSAV delayed in offering a position to him because of "the expletives and candidly rude tone of

voice you displayed when you spoke with our recruiters." J.R. 164. As to this call, McClam disputes Yellin's account. He asserts that he never used profanity and never yelled at Yellin. According to McClam, it was Yellin who spoke in an offensive way and made him feel "like a criminal." J.R. 139. Again, where there is a dispute of fact over the details of that conversation, the Court must consider the evidence in the light most favorable to McClam.

Yet even under McClam's version of events, the conversation went very poorly. According to the written account he provided to Caldrone six days after the call, when Yellin sounded irritated at McClam's efforts to discuss his situation with her, McClam became offended at what he perceived as Yellin's condescending attitude. When he asked her to hear him out and she did not seem to want to listen to him, he asked her for the PSAV hiring policy as well as the telephone number for the Human Resources Department, causing her to hang up. McClam then called her back and told her she was being "unprofessional" and that she was making him feel "like a criminal." *Id.* McClam acknowledged that when Yellin told him that she believed he had lied on his application by not stating that he had any pending charges, he had "had enough," and he "spoke out and over" Yellin to correct "her lies and accusations." *Id.* He said that she was "not being honest" and told her "you're lying." J.R. 44. He also acknowledged that at one point, Yellin asked if she could record the phone call, and that at the end, he asked for the phone number for HR or her supervisor.

When asked whether he raised his voice at Yellin, McClam said it "depend[ed] on the conversation," J.R. 19. When asked the same question about this particular exchange, McClam responded, "[m]aybe a little" and that "[i]t wasn't like I was yelling at the top of my voice." J.R. 44. McClam later acknowledged that his tone "*may* have been strong" because he was "frustrated by the apparent situation." J.R. 164.

Thus, while there is a dispute of fact as to the details of the conversation, who was responsible for its negative tone, and who was more offensive to the other, under either version, McClam spoke and acted in a manner that offended Yellin, including raising his voice to a degree and speaking over Yellin at times, calling her unprofessional, accusing her of lying and not being honest, and asking for the phone number of HR and her supervisor.  McClam recognized the conversation had gone very badly when he told White that he was concerned that Yellin would take the conversation "personally" and that he would not receive a "fair shot," and when he told Caldrone that he was concerned that he might not be hired because of Yellin's involvement in the process and that he did not want "personal feelings" to prevent him from being hired.  J.R. 140. Where the January 21 call with Yellin preceded any protected activity by McClam, any decision to rescind the offer based on McClam's conduct during that call would not be retaliatory.  Because even under McClam's account of the January 21 conversation, the negative exchange with Yellin was a legitimate, non-retaliatory reason to rescind the conditional offer on the Doubletree Technician position, that account does not demonstrate that this stated reason was a pretext for unlawful retaliation.  *See Holland*, 487 F.3d at 218; *Richey v. City of Independence*, 540 F.3d 779, 785–86 (8th Cir. 2008) (finding that where the defendant asserted that the plaintiff was terminated in part for threatening, intimidating, coercing, or abusing others, the plaintiff had not provided sufficient evidence to suggest that the defendant's proffered reason was pretextual); *Jackson v. Kansas City Kansas Pub. Sch. Unified Sch. District No. 500*, 799 F. App'x 586, 592 (10th Cir. 2020) (finding no evidence of pretext where a plaintiff was terminated, in part, because of her use of "abusive language" in a dispute with a co-worker).

The only point on which McClam makes headway on the issue of pretext is his assertion that during the January 26 call, White or Yellin told him that the offer was being rescinded not

because of his pending criminal charges or because his interactions with Yellin on January 21 were offensive, but because they had hired someone else for the position.  Although Yellin denies having made that statement, the Court must construe the evidence in the light most favorable to McClam and credit his claim at this stage.  Because PSAV actually offered the position to the new Doubletree Technician on January 27, such an inaccurate statement would provide some evidence that the stated reasons were pretextual.  That evidence, however, is not dispositive.  *See Jackson*, 799 F. App'x at 592 (rejecting the argument that the proffered legitimate, non-discriminatory reason for termination, the use of abusive language to other employees, was necessarily pretextual because at the time of termination the plaintiff was provided with a different reason, that she was terminated because of poor work performance).  It is also of limited value because Textus, who is African American, had already been engaged in identifying and interviewing other individuals for the position leading up to January 27, and because the selected candidate, Kerlun Samuels, was also African American.  Nevertheless, on this point, McClam has provided some evidence to support an argument of pretext.

## VI.    Intentional Retaliation

Although McClam has successfully navigated the various requirements of the *McDonnell Douglas* framework for analyzing a retaliation claim, the Court must still consider whether, in the end, there is sufficient evidence to support a finding of unlawful retaliation by PSAV.  As the United States Supreme Court has stated in the analogous context of a discrimination claim, "[a]lthough intermediate evidentiary burdens shift back and forth under [the *McDonnell Douglas* ] framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dept. of Community Affairs v.*

*Burdine*, 450 U.S. 248, 253 (1981)).  Even if a plaintiff has established a *prima facie* case and presented evidence that the asserted justification for the action was false, the evidence may still be insufficient support a finding of liability.  *Id*. at 148.  Thus, the Court must consider "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered" to determine whether judgment as a matter of law is appropriate.  *Id.* at 148–49.  "[I]f the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment may be warranted.  *Id.* at 148.

Here, there must be sufficient evidence to support a finding that McClam was denied the Doubletree Technician position not because of his pending criminal charges and his negative conversation with Yellin, or even because of any retaliation for his complaints about Yellin or about what he perceived to be a policy of discrimination against individuals with pending criminal charges, but because of retaliation for the specific act of complaining about race discrimination. A review of the record reveals virtually no evidence to support this conclusion.  Although the Court has concluded that McClam has presented sufficient evidence to support a finding that in his January 21 discussion with White he referenced discrimination in a way that should have been understood as a complaint against race discrimination, White testified that he was unaware of any race discrimination complaint, and there is little evidence that any such complaint had any impact on him.  McClam's account of that conversation reflects that any complaint about race discrimination was mixed in with more specific complaints about the conversation he had just had with Yellin and his concerns that PSAV might not hire him because of his pending criminal

charges.  Where McClam stated that White "was very patient" during the call and that by the end of that conversation, White had actually agreed to hold the position open until after the January 29 hearing and to talk to Yellin—essentially the outcome that McClam sought from the call—he has offered no evidence to suggest that White was disturbed by any mention of race discrimination. J.R. 140.  To the extent that after that call White took a less favorable position toward McClam on January 26, the only intervening event was his subsequent discussion with Yellin, during which he presumably heard Yellin's account of the January 21 call.

Indeed, throughout this entire episode, McClam focused on the possible policy or practice not to hire individuals with pending criminal charges, and Yellin's unhappiness with him because of their disagreements in the January 21 call, rather than retaliation for a complaint of race discrimination, as the reasons that he was not hired.  In the three complaint letters he wrote after January 26—on January 27, March 16, and April 14—he highlighted Yellin's condescending attitude toward him, the possibility that Yellin had negative personal feelings from the January 21 call, and PSAV's unwillingness to hold a position open for an individual who had pending criminal charges that he expected to be dismissed, without any reference to race.  Where in that sequence of letters even McClam did not identify his complaint about race discrimination as the triggering event for PSAV's hiring decisions, it is evident that this dispute was not about retaliation for a race discrimination complaint.

Moreover, there is no evidence, testimonial or documentary, that PSAV employees made any racially derogatory comments to McClam or to anyone else, or any statements expressing any intent to retaliate against anyone for opposing discrimination.  In fact, McClam cannot identify a single instance in which Yellin, White, Caldrone, or Russell said anything about his race throughout all of their interactions.

26

The actual hiring decisions also do not advance McClam's claims. Notably, the individual actually hired for the Doubletree Technician position was African American. The individual hired for the Rockville Technician position had a college degree, a master's degree, and prior AV experience and thus could not be deemed to be less qualified than McClam. *See Young v. Lehman*, 748 F.2d 194, 198 (4th Cir. 1984) ("The rule in this circuit is that where relative qualifications are advanced as the nondiscriminatory reason for an employment decision, the plaintiff has the burden of establishing that she was better qualified than the successful applicant.").

Finally, the subsequent actions by PSAV in response to McClam's additional complaints undercuts the claim of retaliation for making a race discrimination complaint. Beginning on January 26 itself, PSAV personnel consistently invited McClam to apply when additional positions came available. When faced with the additional written complaints focused on McClam's alleged mistreatment by Yellin and alleged discrimination against individuals with pending criminal charges, PSAV actually offered McClam a part-time Technician position that paid the same wage, accrued employee benefits, and had the same job title and responsibilities. Although the position may not have been ideal because it was a floater position based in a warehouse, required travel to multiple hotels rather than providing work in a single hotel, and did not guarantee a particular number of hours, there is no evidence that a position precisely like the Doubletree Technician position was available at the time. PSAV also communicated to McClam that he would be able to apply to transfer to such a position once it became available without having to go through the hiring process for outside candidates. This response to the additional complaints, of offering McClam a reasonably comparable position, further undermines the claim of unlawful retaliation. *Cf. Hanchey v. Energas Co.*, 925 F.2d 96, 99 (5th Cir. 1990) (finding that an offer of a different

position that was rejected by the plaintiff did not support the claim that the stated reasons for eliminating the plaintiff's original position were "unworthy of credence").

When considering the totality of the facts and events between January and April 2015 in the light most favorable to McClam, the Court finds that even though McClam can establish a *prima facie* case of retaliation relating to the Doubletree Technician position, a reasonable factfinder would not be able to conclude that PSAV's legitimate, non-retaliatory reasons for taking adverse employment actions were actually pretextual and that the decision to rescind his conditional offer was the result of unlawful retaliation for asserting a claim of race discrimination. *Reeves*, 530 U.S. at 148. *Cf. Holland*, 487 F.3d at 218 (granting summary judgment where there was insufficient evidence to show that a termination was based on retaliation rather than a belief that the plaintiff had made threatening statements). Thus, the Court will grant PSAV's Motion for Summary Judgment.

## CONCLUSION

For the foregoing reasons, PSAV's Motion for Summary Judgment will be GRANTED. A separate Order shall issue.


Date:  May 12, 2020                                     /s/ *Theodore D. Chuang*
                                                        THEODORE D. CHUANG
                                                        United States District Judge

28